## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISCTRICT OF MICHIGAN

KENNETH WEBB,

               Plaintiff,

v.

ESTATE OF DALE HOFFMAN,
ESTATE OF WILLIAM KENNON,
ESTATE OF LLOYD STAMPER,
and ESTATE OF SERGEANT
WILLIAM MCFARLANE,

               Defendants.

Case No.

Hon.

---

| **COMPLAINT AND DEMAND FOR JURY TRIAL** |
|---|

---

Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Dayja S. Tillman (P86526)
**Goodman Hurwitz & James, P.C.**
684 W. Baltimore St., #201
Detroit, MI 48202
(313) 567-6170
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
dtillman@goodmanhurwitz.com

*Attorneys for Plaintiff*

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff **KENNETH WEBB**, by and through his attorneys, GOODMAN HURWITZ & JAMES, P.C., complaining of Defendants ESTATE OF LLOYD STAMPER, ESTATE OF WILLIAM KENNON, ESTATE OF DALE HOFFMAN, and ESTATE OF SERGEANT WILLIAM MCFARLANE, and for his Complaint in this matter, states as follows:

## INTRODUCTION

1.      Between July 1986 and October 1987, Plaintiff **KENNETH WEBB**, then a 30-year-old man living with severe cognitive disabilities, depression, addiction and trauma, was wrongfully arrested, imprisoned, prosecuted, convicted and sentenced to life in prison for the June 5, 1986 shooting death of pharmacist Marc Blaske in Ypsilanti Township, Michigan, a crime he did not commit.

2.      On August 10, 1987, Mr. Webb was convicted of armed robbery and first-degree felony murder, and on October 16, 1987, he was sentenced to two concurrent life terms.

3.      Mr. Webb's wrongful conviction was the direct result of deliberate misconduct and a deeply flawed investigation by former Washtenaw County Sheriff's Department Officers Detectives **LLOYD STAMPER**, **WILLIAM KENNON**, and **DALE HOFFMAN**, and their supervising Sergeant **WILLIAM McFARLANE**. Acting under color of state law and within the scope of their

2

employment**,** these officers fabricated a confession after turning off their recorder, ignored Mr. Webb's obvious impairments, suppressed evidence identifying other viable suspects, and failed to disclose exculpatory evidence, including materials that directly contradicted their case against him.

4.      In 2022, after more than thirty-five years of incarceration, the University of Michigan Law School's Innocence Clinic and the Washtenaw County Prosecutor's Office Conviction Integrity and Expungement Unit jointly reinvestigated Mr. Webb's case.

5.      The reinvestigation provided evidence that Mr. Webb's "confession" was fabricated by Detectives **KENNON** and **STAMPER**, that the investigating officers failed to pursue or disclose evidence identifying alternate suspects, and that Mr. Webb had a strong and documented alibi placing him miles away at the time of the crime.

6.      On October 21, 2022, the Washtenaw County Prosecutor stipulated that "there is clear and convincing evidence that Mr. Webb is innocent for [*sic*] the crimes which he [wa]s convicted…" and jointly filed, with the Michigan Innocent Clinic, a motion to vacate Mr. Webb's conviction and to dismiss the case.

7.      On November 3, 2022, the Washtenaw County Circuit Court vacated Mr. Webb's conviction and the Washtenaw County Prosecutor's Office dismissed all charges against him. Mr. Webb was formally released that same day, after more than

thirty-six years of wrongful imprisonment.

8. This civil-rights action seeks to hold the responsible officers—**STAMPER**, **KENNON**, **HOFFMAN**, and **McFARLANE**—accountable under 42 U.S.C. § 1983 for fabricating evidence, coercing and misrepresenting an unrecorded confession, suppressing exculpatory and impeachment evidence, and initiating and maintaining a malicious prosecution that deprived Mr. Webb of his liberty for more than three decades.

9. Mr. Webb brings this action to vindicate his constitutional rights and to obtain compensation for the significant injuries caused by his wrongful arrest, prosecution, and incarceration.

## JURISDICTION AND VENUE

10. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

11. This Court has subject-matter jurisdiction over Plaintiff's constitutional claims pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2202.

12. Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

13. Venue is proper under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events giving rise to this claim occurred within judicial district of the Eastern District of Michigan, Southern Division.

## THE PARTIES

14.     Plaintiff **KENNETH WEBB** is a 69-year-old resident of the State of Michigan. At all times relevant to the allegations made in this Complaint, other than during his wrongful incarceration, Mr. Webb was a resident of Michigan.

15.     Defendant **ESTATE OF DALE HOFFMAN** is the legal entity that must stand in the place of Dale Hoffman (deceased). At all times relevant to this action, Sheriff's Deputy Detective (hereafter "Detective") **HOFFMAN** was a detective with the Washtenaw County Sheriff's Department, acting under color of law and within the scope of his governmental authority and employment, pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the Washtenaw County Sheriff's Department.

16.     Defendant **ESTATE OF WILLIAM KENNON** is the legal entity that must stand in the place of William Kennon (deceased). At all times relevant to this action, Sheriff's Deputy Detective (hereafter "Detective") **KENNON** was a detective with the Washtenaw County Sheriff's Department, acting under color of law and within the scope of his governmental authority and employment, pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the Washtenaw County Sheriff's Department.

17.     Defendant **ESTATE OF LLOYD STAMPER** is the legal entity that must stand in the place of Lloyd Stamper (deceased).  At all times relevant to this

5

action, Sheriff's Deputy Detective (hereafter "Detective") **STAMPER** was a detective with the Washtenaw County Sheriff's Department, acting under color of law and within the scope of his governmental authority and employment, pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the Washtenaw County Sheriff's Department.

18.     Defendant **ESTATE OF WILLIAM McFARLANE** is the legal entity that must stand in the place of William McFarlane (deceased). At all times relevant to this action, Sergeant **McFARLANE** was a sergeant and supervisor with the Washtenaw County Sheriff's Department, acting under color of law and within the scope of his governmental authority and employment, pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the Washtenaw County Sheriff's Department. He supervised the investigation of the crimes with which Plaintiff was charged and, as a Sergeant with the Washtenaw County Sheriff's Department, **McFARLANE** supervised the actions of the other individually named and designated Detectives herein.

## STATEMENT OF FACTS

### The Knight's Pharmacy Shooting

19.     On June 5, 1986, pharmacist Marc Blaske was shot and killed during an armed robbery at Knight's Pharmacy inside the Hewitt Road Clinic, in Ypsilanti, Michigan.

6

20.    On June 4, 1986 – one day before the homicide – witness observed a distinct van which appeared to be "casing" the clinic parking lot.

21.    On the morning of June 5, 1986, witnesses observed a suspect at Knight's Pharmacy between approximately 10:00 A.M. and 10:40 A.M.; a van similar to one observed the day before was seen fleeing the scene shortly after the shooting.

22.    Eyewitnesses described the suspect as a thin white male, approximately 25 to 35 years old, between 5 foot 8 and 5 foot 10, with curly dark brown hair and a "Fu Manchu" mustache, wearing aviator sunglasses and a camouflage bush hat; a composite sketch of the suspect was prepared based on this description.

23.    At all times during the course of the robbery and murder, Plaintiff Kenneth Webb (hereafter "Mr. Webb") was both provably nowhere near the scene of the crime, and did not fit the description of the suspect -- as he was no taller than 5 foot 6 and did not have a "Fu Manchu" mustache – a description that did, however, fit a suspect who had committed an almost identical robbery at another pharmacy in West Bloomfield Township one month earlier.

### Ohio Highway Stop and Off-Tape Interrogation

24.    On July 4, 1986, an Ohio State Highway Patrol officer stopped Mr. Webb in Marion County, Ohio for suspected drunk driving.

25.    In the days preceding the stop, Mr. Webb was undergoing a manic

7

alcohol-induced mental health crisis, had not slept for more than 24 hours and had attempted to seek emergency mental-health care.

26.     While intoxicated, sleep-deprived, and in severe psychological distress, Mr. Webb made a confused remark to the Ohio patrol officer suggesting he might be wanted for murder in Michigan; no recording exists of this remark, and officer accounts differ as to whether Mr. Webb referenced the murder of a "farmer" or "pharmacist" at the time.

27.     Prior to the stop and subsequent arrest, Mr. Webb had been repeatedly hospitalized for psychiatric and substance abuse treatment, including a recent commitment at the Ypsilanti Regional Psychiatric Hospital. Records documented his long-standing cognitive impairments, intellectual disability, depression, and alcohol-use disorder, as well as episodes of disorientation and suicidal ideation. These conditions were knowable, known, and readily observable to law enforcement officers at the time of Mr. Webb's interrogation.

28.     Nonetheless, Detectives **KENNON** and **STAMPER** of the Washtenaw County Sheriff's Department traveled to Ohio and conducted a custodial interview of Mr. Webb at the Marion County Sheriff's Office while he was in custody, still highly intoxicated, and without counsel.

29.     The detectives began recording the interview after advising Mr. Webb of his *Miranda* rights. According to their own reports, Mr. Webb appeared confused,

8

disoriented, and in withdrawal, but attempted to respond to questions anyway. Detectives **KENNON** and **STAMPER** then proceeded to turn the recorder off, insisting that Mr. Webb refused to speak with them while it was still on.

30.    With the recorder off, Detectives **KENNON** and **STAMPER** continued questioning Mr. Webb outside the presence of counsel. Approximately seventeen minutes later, they resumed the recording. On the resumed recording, Detective **KENNON** stated that Mr. Webb "did not wish to answer any questions" and would wait until he was returned to Michigan before speaking further. Despite this assertion, both detectives later claimed that Mr. Webb allegedly "confessed" during the seventeen minutes that the tape recorder was off.

31.    Shortly after the interrogation, Mr. Webb appeared before an Ohio court for an extradition hearing. During the proceeding, the judge informed him that Michigan authorities were charging him with murder. On the record, Mr. Webb expressed confusion and repeatedly asked whether he was "actually being charged for murder." His statement at the hearing demonstrated that he did not understand that a confession had been attributed to him, consistent with his impaired condition and the absence of any recorded confession.

32.    After Mr. Webb was extradited to Michigan, he was booked into the Washtenaw County Jail and then subsequently transported to a local hospital for medical detoxification.

33.     While hospitalized, Mr. Webb told staff that he wanted to speak with the detectives who questioned him in Ohio – **STAMPER** and **KENNON**. When Detectives **KENNON** and **STAMPER** met with him, Mr. Webb said that the statements they had attributed to him in Ohio were not true. Neither Detectives **KENNON** or **STAMPER** recorded, documented, or disclosed this recantation or denial, at which time he recanted the alleged "confession" he had made to the Ohio State Patrol Officer, saying it was a false statement.

34.     Moreover, Detectives **KENNON** and **STAMPER** each prepared written reports stating that Mr. Webb had confessed to the pharmacy murder during the unrecorded portion of the interrogation. No portion of any confession was captured on tape, and no witness corroborated their account.

35.     At the time of the interrogation, Mr. Webb was visibly intoxicated, in alcohol withdrawal, sleep-deprived, suicidal, and cognitively impaired – conditions the interrogating deputies documented in their own notes and reports, noting he was "detoxing" "confused" and "not making any sense" during questioning. They did not obtain a medical evaluation, nor did they pause the interview; instead, they relied on the unrecorded portion as the basis for their reports. In fact, Detectives **KENNON** and **STAMPER** both later testified to the fact that Mr. Webb agreed to talk to them on the basis that they agreed get him medical attention.

36.     Subsequent psychological testing conducted during the 2022

10

reinvestigation confirmed what was clearly evident to the Detectives in 1986—that Mr. Webb suffered from a significant intellectual disability. This finding corroborates that any alleged "confession" could not have been voluntary or reliable, and that the detectives exploited his impairments to fabricate a statement against him.

37.    Relying on the reports prepared by Detectives **KENNON** and **STAMPER**, Washtenaw County prosecutors obtained a warrant charging Mr. Webb with first-degree felony murder and armed robbery.

38.    The detectives' unrecorded account was the *only* evidence purporting to link Mr. Webb to the crime; no physical evidence, eyewitness identification, or corroborating statement tied him to the murder. At trial, the prosecution emphasized the alleged confession attributed to Mr. Webb by **KENNON** and **STAMPER**, and during deliberations the jury specifically requested a read-back of their testimony describing it. This fabricated account was critical to establishing probable cause and securing conviction; without it, there was no basis to charge, detain or prosecute Mr. Webb.

39.    Before trial, Mr. Webb's attorney unsuccessfully moved to suppress the statements attributed to him. At the hearing, Dr. James Bond, a psychologist at the University of Michigan Department of Psychiatry, testified that, given Mr. Webb's history of alcoholism, mental health issues, suicidality, and fear of going through

withdrawal in custody, any confession obtained under the circumstances was unreliable and likely fabricated.

40.     On August 10, 1987, the jury nonetheless convicted Mr. Webb of first-degree felony murder and armed robbery, based almost entirely on his false confession that the trial court allowed into evidence.

41.     On October 16, 1987, Mr. Webb was sentenced to two concurrent life terms.

42.     Throughout the proceedings and for the next thirty-six years, Mr. Webb consistently maintained his innocence. At his sentencing, he stated that he was being imprisoned "for a crime I did not commit" and maintained that he was at the Ann Arbor Social Security Office the morning of the crime.

43.     Despite Mr. Webb's repeated assertions of innocence and his documented alibi, the prosecution against him moved forward based entirely on the accounts and representations of Detectives **KENNON**, **STAMPER** and **HOFFMAN**, and their supervisor Sgt. **McFARLANE**.

44.     These officers not only fabricated and mischaracterized evidence but also withheld critical information that would have demonstrated Mr. Webb's innocence and undermined their own credibility.  Their conduct, described in the sections below, deprived Mr. Webb of a fair trial and led directly to his wrongful conviction and decades-long false imprisonment.

**Officers Withheld Exculpatory and Impeachment Evidence**

45.     After the June 5, 1986, Knight's Pharmacy shooting, two independent eyewitnesses provided detailed descriptions of a white male, 25–35 years old, 5′7″–5′10″, with curly dark, "bushy kinky" hair, a "Fu Manchu" style mustache, aviator sunglasses, and a camouflage bush hat.  Based on those accounts, investigators produced two nearly identical composite sketches of the suspect.

46.     During the same period, Detective **DALE HOFFMAN** and Sergeant **WILLIAM McFARLANE** reviewed investigative materials from a May 5, 1986, armed robbery of a pharmacy in West Bloomfield Township – committed only weeks earlier – which bore a nearly identical modus operandi and suspect description. A composite sketch of that suspect was created based on a very similar description: a thin, white male, with a "Fu Manchu" mustache, a hat and sunglasses. The officers' own notes acknowledged these similarities.

47.     Despite the clear exculpatory value of that information, Detective **HOFFMAN** and Sergeant **McFARLANE** never disclosed the West Bloomfield materials—the composite sketch, or any related correspondence—to Mr. Webb's defense team, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The trial record contains no reference to that earlier robbery or to any alternate suspect investigation.  This evidence would have directly supported a third party-perpetrator defense.

13

48.    Indeed, there is no indication that there was ever any follow-up investigation of the May 5 armed robbery, despite the obvious similarities between the two crimes, one of which Mr. Webb was wrongfully convicted of.

49.    Defendants likewise failed to record or disclose Mr. Webb's recantation following his extradition to Michigan.  When hospitalized for detoxification at the Washtenaw County Jail infirmary, Mr. Webb requested to speak with Detectives **KENNON** and **STAMPER** and informed them that the statements they had attributed to him in Ohio were false and made while he was intoxicated and disoriented.  The detectives did not document or disclose this communication and continued to represent to prosecutors that Mr. Webb had confessed to the crime.

50.    In addition, Defendants **KENNON** and **STAMPER** suppressed impeachment material concerning their own credibility.

51.    At the time of Mr. Webb's trial, Detective **STAMPER** was suspended without pay and demoted from his position as Sheriff's Deputy Detective pending an internal investigation for falsifying an interrogation transcript in another homicide case involving two teenage suspects. Specifically, Detective **STAMPER** was on suspension the day he testified at Mr. Webb's trial. The Sheriff's Department's disciplinary action and investigative findings—directly relevant to his credibility and the integrity of is interrogation methods—were never disclosed to Mr. Webb's defense nor to the jury, even though **STAMPER** was the State's primary witness

regarding Mr. Webb's alleged confession, thus making his credibility a material fact for the jury's consideration.

52.    Similarly, subsequent to Mr. Webb's conviction, Detective **KENNON** was convicted on multiple counts of criminal sexual conduct for falsely posing as a Native American counselor to obtain access to and exploit juveniles. This served as a clear demonstration of a continuing pattern of deception and abuse of authority consistent with his conduct during Mr. Webb's interrogation.

53.    The misconduct of both officers calls into question both their credibility and reliability of the unrecorded statements attributed to Mr. Webb and the integrity of the investigation that led to his wrongful conviction.

54.    Each of these items—the alternate-suspect materials, Stamper's disciplinary file, and the hospital recantation—was favorable to the defense and material to Mr. Webb's guilt or punishment.  The suppression of this information deprived Mr. Webb of the opportunity to impeach the State's key witnesses, present evidence identifying other suspects, and challenge the reliability of the alleged confession.

55.    The withholding of this evidence was deliberate and consistent with a pattern of investigative misconduct that infected the entire case.  Had the materials been timely disclosed, Mr. Webb's defense would have had compelling evidence demonstrating both that the confession was unreliable and that the crime was likely

committed by another person. The suppression of this information violated Mr. Webb's clearly established rights under the Fourteenth Amendment and directly contributed to his wrongful conviction and thirty-six years of false imprisonment.

### Officers Deliberately Ignored and Failed to Investigate Evidence Identifying Other Suspects and Contradicting Mr. Webb's Alleged Confession

56.     Beyond concealing exculpatory materials, Detectives **KENNON**, **STAMPER** and **HOFFMAN**, and Sergeant **McFARLANE** affirmatively failed to investigate multiple lines of evidence that contradicted their theory of Mr. Webb's guilt and pointed to other viable suspects.

57.     Despite acknowledging the similarities between the May 5, 1986, West Bloomfield pharmacy robbery and the June 5 Knight's Pharmacy robbery and homicide, Defendants conducted no substantive follow-up to determine whether the same perpetrator committed both crimes. There is no record of any attempt to compare physical evidence, interview West Bloomfield investigators, or show Knight's Pharmacy witnesses the West Bloomfield composite sketch.

58.     Defendants similarly chose not to pursue leads arising from eyewitness information developed during the Ypsilanti investigation. Witnesses reported that, on June 4—the day before the murder—a man in a distinctive van was seen "casing" the clinic where Knight's Pharmacy was located. Detectives identified the vehicle's owner but blindly accepted his unverified claim that he had merely been "waiting"

while a real-estate agent showed his house to prospective buyers. They did not verify his account, obtain a photo, or ask his whereabouts at the time of the shooting.

59.    Other eyewitnesses reported seeing a different white male, not resembling Mr. Webb, at a nearby restaurant on the morning of the shooting, wearing the same camouflage hat and sunglasses described by witnesses from the pharmacy.  The same man was seen at that location again a week later.  The officers documented these reports but took no meaningful investigative steps to identify or rule out that individual.

60.    Investigative files also reference a typed, unsigned letter found near the crime scene stating that the victim was killed by a Black male and a white male in a "drug hit."  The report indicated that the letter was sent to the Michigan State Police for fingerprint analysis, but no such laboratory results or follow-up appear in the file, and the letter was never produced to the defense.

61.    None of these investigative leads were followed to completion or disclosed to Mr. Webb's counsel.  Each, if properly pursued, would have provided powerful corroboration that someone other than Mr. Webb committed the crime and would have undermined the detectives' narrative that Mr. Webb acted alone.

62.    The deliberate failure to investigate alternative suspects and to test conflicting evidence reflected a reckless disregard for truth.  By ignoring clear exculpatory information and refusing to develop evidence inconsistent with their

17

fabricated confession narrative, these officers caused Mr. Webb to be wrongfully prosecuted and convicted in violation of his constitutional rights.

### Investigating Officers Ignored Mr. Webb's Verifiable Alibi and Other Evidence Demonstrating His Innocence

63.     From the earliest stages of the investigation, Mr. Webb consistently maintained that he was in Ann Arbor, not Ypsilanti, at the time of the June 5, 1986, Knight's Pharmacy robbery and homicide. His account was verifiable through contemporaneous government records and independent eyewitness testimony.

64.     Official records from the Social Security Administration (SSA) confirmed that Mr. Webb signed in at the SSA office located at 200 East Liberty Street in Ann Arbor at 9:07 a.m. on June 5, 1986 – approximately eight miles from the crime scene. The SSA employee who assisted him testified that their meeting concluded between 10:15 and 10:30 a.m., less than fifteen minutes before the shooting occurred in Ypsilanti Township.

65.     After leaving the SSA office, Mr. Webb crossed the street to a local restaurant known as Bill's Coffee Shop, where he encountered William Briede, a licensed private investigator who knew him from prior acquaintance. Mr. Briede testified that he and Mr. Webb spoke for approximately forty-five minutes between 11:30 a.m. and 12:30 p.m., during which Mr. Webb stated he had just come from the SSA office. Mr. Briede observed Social Security papers in Mr. Webb's hands.

18

66.    The distance and timing made it physically impossible for Mr. Webb to have traveled from the Ann Arbor SSA office to the Knight's Pharmacy crime scene in time to commit the offense. Even by car (which Plaintiff did not have at the time), the trip would have taken at least 17–20 minutes; by public transit (upon which Plaintiff relied that day), considerably longer.

67.    Despite possessing this verifiable information, Detectives **KENNON**, **STAMPER** and **HOFFMAN**, and Sergeant **McFARLANE** failed to make any meaningful effort to corroborate or credit Mr. Webb's alibi. They did not obtain or preserve the SSA sign-in sheet, interview additional SSA personnel, or attempt to verify travel times. Nor did they include Mr. Briede's statement in their investigative summaries.

68.    Instead, the officers advanced a theory that Mr. Webb left Ann Arbor, traveled to Ypsilanti, committed the offense, and returned—an explanation unsupported by any evidence and inconsistent with the known timing of events. Their failure to investigate or disclose corroborating alibi evidence reflected deliberate indifference to the truth and reckless disregard for Mr. Webb's innocence.

69.    Had these investigating officers, Detectives **KENNON**, **STAMPER** and **HOFFMAN**, and Sergeant **McFARLANE,** properly investigated the SSA and eyewitness evidence, they would have confirmed that Mr. Webb could not have been at the crime scene when the murder took place. Their decision to ignore that

information—and to proceed based solely on an unrecorded (fabricated) and unreliable confession—directly caused Mr. Webb's wrongful prosecution and thirty-six years of imprisonment.

**Post-Conviction Reinvestigation and Vacatur of Mr. Webb's Convictions**

70.    In 2022, after Mr. Webb had spent more than thirty-five years wrongfully imprisoned, the University of Michigan Law School's Innocence Clinic (hereafter "MIC") and the Washtenaw County Prosecutor's Office Conviction Integrity and Expungement Unit (hereafter "CIEU") undertook a joint reinvestigation of his case.

71.    The reinvestigation included a full review of the original police files, trial transcripts, and newly located materials that had not been disclosed to the defense in 1986 and 1987. The MIC and CIEU, jointly, also re-interviewed surviving witnesses, reviewed forensic evidence, and examined the circumstances surrounding the purported confession attributed to Mr. Webb by Detectives **KENNON** and **STAMPER**.

72.    The joint review identified multiple deficiencies in the original investigation. Among other findings, the CIEU concluded that: (a) the alleged confession lacked any contemporaneous recording or corroboration; (b) material impeachment and exculpatory evidence had been withheld from the defense; and (c) Mr. Webb had a well-documented and credible alibi placing him miles away from

the crime scene at the time of the shooting.  These findings directly undermined the basis for Mr. Webb's conviction.

73.    On October 21, 2022, the Washtenaw County Prosecutor's Office, through the CIEU, filed a stipulation and joint motion with the MIC stating that "there is clear and convincing evidence that Mr. Webb is innocent of the crimes for which he was convicted," and requesting that the convictions be vacated and the charges dismissed.

74.    On November 3, 2022, the Washtenaw County Circuit Court granted the motion, vacated Mr. Webb's convictions and sentences, and dismissed all charges against him.  Mr. Webb was released from custody that same day, formally concluding more than thirty-six years of wrongful incarceration and false imprisonment.

## CLAIMS FOR RELIEF

### COUNT I - 42 U.S.C. § 1983
### Fourteenth Amendment Due Process

75.    Plaintiff Webb incorporates by reference each of the paragraphs of this Complaint as if fully restated herein.

76.    As described more fully above, the Detectives **STAMPER**, **KENNON**, and **HOFFMAN**, and Sergeant **McFARLANE**, all acting individually, jointly, severally, under color of law and within the scope of their employment, intentionally, knowingly, and with reckless disregard for the truth, deprived Plaintiff of his clearly

established constitutional right to a fair and impartial criminal proceeding.

77.    In the course of investigating and prosecuting Plaintiff Webb, Detectives **KENNON**, **STAMPER**, **HOFFMAN**, and Sergeant **McFARLANE:**

a.   Fabricated evidence, including a false and/or coerced unrecorded confession they attributed to Plaintiff;

b.   Withheld material exculpatory and impeachment evidence, including information identifying other viable suspects, evidence contradicting the State's theory, and disciplinary findings concerning their own misconduct; and

c.   Presented or caused to be presented false and misleading information to prosecutors and the court.

78.    Detectives **KENNON**, **STAMPER**, **HOFFMAN**, and Sergeant **McFARLANE** acted deliberately, intentionally, and with reckless disregard for the truth, knowing that their conduct would deprive Plaintiff of a fair criminal trial and that their fabricated and suppressed evidence would be used to secure his conviction.

79.    The foregoing conduct violated Plaintiff's clearly established rights under the Fourteenth Amendment's Due Process clause, including his right to a fair trial to be free from the use of fabricated, coerced, or suppressed evidence, as

recognized by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.[1]

80.    As a direct and proximate result of the actions of Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE**, Plaintiff **WEBB** was wrongfully arrested, prosecuted, convicted, and imprisoned for more than thirty-six years, suffering severe loss of liberty, physical and emotional pain, loss of family relationships, reputational harm, and economic damages.

81.    All the acts and omissions committed by Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE**, individually, jointly and severally, were done intentionally, recklessly, deliberately, outrageously and/or in bad faith, so as to entitle the Plaintiff to both compensatory and punitive damages.

82.    As a direct and proximate result of the foregoing actions by Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE**, Plaintiff Webb was wrongfully arrested, prosecuted, convicted, and imprisoned for over thirty-six years, suffering the following injuries and damages, among others:

    a.  Loss of liberty, and wrongful imprisonment;

    b.  Physical injuries, including assaults, illness and inadequate medical care while incarcerated;

    c.  Pain and suffering;

---

[1] *See also Napue v. Illinois*, 360 U.S. 264 (1959); *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019).

d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e. Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f. Loss of family relationships;

g. Damage to reputation, business and property;

h. Legal expenses;

i. Loss of earnings and earning potential; and

j. Continuing injuries and damages as fully set forth above.

## COUNT II – 42 U.S.C. § 1983
## Fourth Amendment - Federal Malicious Prosecution Claim

83. Plaintiff Webb incorporates by reference each paragraph of this Complaint as if fully restated here.

84. As described more fully above, Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE** individually, jointly, and in conspiracy with one another, under color of law and within the scope of their employment caused criminal proceedings to be initiated and continued against Plaintiff without probable cause.

85. In doing so, Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and

Sergeant **McFARLANE** made, influenced, and/or participated in the decision to initiate and continue those proceedings despite knowing, or acting with reckless disregard for the truth, that the case lacked credible evidence and rested on fabricated and/or unreliable information.

86.    Detectives **KENNON** and **STAMPER** fabricated and/or misrepresented and distorted material evidence by reporting that Plaintiff had allegedly confessed to a crime he did not commit during an unrecorded portion of his interrogation after they turned off the tape recorder. They acted knowingly, or with reckless disregard for the truth, in failing to document or preserve any recording of that alleged statement and later presented or caused it to be presented to prosecutors and the court as a voluntary and reliable confession, despite Plaintiff's obvious impairment, intoxication, confusion, and subsequent recantations. Their conduct caused this unreliable and uncorroborated account to be treated as genuine evidence of guilt.

87.    Statements by Detectives **STAMPER** and **KENNON** regarding Plaintiff's alleged culpability were made with knowledge that Plaintiff's confession was unreliable because it was either fabricated by the Detectives **KENNON** and **STAMPER** or was a false confession that was elicited by taking advantage of Plaintiff's intellectual disability, mental illnesses, sleep deprivation, and intoxicated state.

88.     Detective **HOFFMAN** and Sergeant **McFARLANE** participated in and/or reviewed the investigation and, knowingly, or with reckless disregard for the truth, withheld exculpatory evidence, including alternate-suspect materials from the May 1986 West Bloomfield Pharmacy robbery and the corresponding composite sketch. They further failed to investigate or disclose additional information contradicting the alleged confession, including verifiable alibi evidence placing Plaintiff miles away from the crime scene. Their actions reinforced the false appearance of probable cause and furthered the wrongful prosecution of Plaintiff.

89.     Sergeant **McFARLANE**, as supervising officer, approved the continuation of the case despite the known absence of probable cause linking Plaintiff to the offense.

90.     The proceedings were instituted and continued maliciously, and without probable cause, in violation of Plaintiff's clearly established Fourth Amendment right to be free from unreasonable seizure through wrongful prosecution.

91.     Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE** were aware that no true or reliable evidence implicated Plaintiff in the June 1986 pharmacy robbery and murder, and that inculpatory evidence was coerced and/or fabricated.

92.     Through these actions, Detectives **KENNON**, **STAMPER**, and

**HOFFMAN**, and Sergeant **McFARLANE** created the false appearance of probable cause and caused prosecutors to initiate and continue criminal proceedings that would not have been pursued or continued had the truth been disclosed.

93.    The criminal charges against Plaintiff Webb were ultimately terminated in his favor on November 3, 2022, when the Washtenaw County Circuit Court vacated his convictions and dismissed all charges.

94.    All acts and omissions of Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE** were undertaken intentionally, knowingly, or with reckless disregard for the truth, entitling Plaintiff to compensatory and punitive damages.

95.    As a direct and proximate result of the foregoing actions by Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE**, Plaintiff Webb was wrongfully arrested, prosecuted, convicted, and imprisoned for over thirty-six years, suffering the following injuries and damages, among others:

      a.  Unreasonable seizure and loss of liberty;

      b.  Physical injuries, including assaults, illness and inadequate medical care while incarcerated;

      c.  Pain and suffering;

      d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.  Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f.  Loss of family relationships;

g.  Damage to reputation, business and property;

h.  Legal expenses;

i.  Loss of earnings and earning potential; and

j.  Continuing injuries and damages as fully set forth above.

## **COUNT III**
## **42 U.S.C. § 1983 Supervisor Liability Claim**

96.  Plaintiff Webb incorporates by reference each paragraph of this Complaint as if fully restated here.

97.  At all relevant times, Sergeant **WILLIAM McFARLANE** was a sergeant and supervisor in the Washtenaw County Sheriff's Department and was the officer in charge of the June 5, 1986, Knight's Pharmacy homicide investigation.

98.  Acting under color of law and within the scope of his employment, Sergeant **McFARLANE** directly supervised Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, approved their investigative actions, exercised command authority over major decisions, and was otherwise personally involved in directing and overseeing the investigation that resulted in Plaintiff Webb's wrongful

28

conviction.

99.    Sergeant **McFARLANE** personally directed the scene response to the June 5, 1986, Knight's Pharmacy shooting, controlled witness handling, and oversaw evidence preservation at the crime scene.

100.    Sergeant **McFARLANE** instructed Detectives **KENNON** and **STAMPER** to travel to Ohio to interrogate Plaintiff WEBB, thereby initiating the custodial interview that produced the unrecorded and unreliable "confession" later used to obtain Plaintiff's arrest and prosecution.

101.    Sergeant **McFARLANE** supervised witness-identification procedures, including maintaining witnesses in his office during the photographic lineup, supervising the lineup procedures, reviewing the resulting reports, and monitoring communications about the case.

102.    During the investigation, Detective **HOFFMAN** forwarded to Sergeant **McFARLANE** a composite sketch and report from a May 5, 1986, West Bloomfield pharmacy robbery that closely matched the suspect description and modus operandi of the Knight's Pharmacy shooting under his investigation. Despite receiving this alternate-suspect information, Sergeant **McFARLANE** seemingly took no action to investigate or disclose it.

103.    Throughout the investigation, Sergeant **McFARLANE** was aware of, approved, and ratified the investigative conduct of the Deputy Detectives under his

supervision, including their fabrication and/or manipulation of an unrecorded confession, suppression of exculpatory and impeachment evidence, and failure to pursue alternate suspects and alibi evidence.

104.   Supervisory Sergeant **McFARLANE** directed, approved, and ratified the conduct that caused the violation of Plaintiff's constitutional rights and/or encouraged or knowingly approved of the actions of other officers under his authority that violated Plaintiff's constitutional rights. Sergeant **McFARLANE** failed to otherwise intervene, correct, or disclose the misconduct of the officers he supervised, furthering the prosecution of Plaintiff Webb.

105.   The actions of these supervisory Sergeant, in his supervisory capacity, violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

106.   All the acts and omissions committed by supervisory Sergeant **McFARLANE** were done intentionally, recklessly, deliberately, outrageously and/or in bad faith, so as to entitle the Plaintiff to both compensatory and punitive damages.

107.   As a direct and proximate result of the foregoing supervisory actions by Sergeant **McFARLANE**, Plaintiff Webb was wrongfully arrested, prosecuted, convicted, and imprisoned for over thirty-six years, suffering the following injuries and damages, among others:

30

a.  Unreasonable seizure and loss of liberty;

b.  Personal and physical injuries, including assaults, illness and inadequate medical care;

c.  Pain and suffering;

d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.  Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f.  Loss of family relationships;

g.  Damage to business and property;

h.  Legal expenses;

i.  Loss of earnings and earning potential; and

j.  Continuing injuries and damages as fully set forth above.

## COUNT IV
## 42 U.S.C. § 1983 Conspiracy to Deprive Constitutional Rights

108.   Plaintiff Webb incorporates by reference each paragraph of this Complaint as if fully restated here.

109.   The aforementioned Detectives and Sergeant, acting within the scope of their employment and under color of law, agreed among themselves and with

other individuals to act in concert in order to deprive Mr. Webb of his constitutional rights, including his rights to due process, all as described in the preceding paragraphs of this Complaint.

110.   In this manner, the Detectives and Sergeant, acting in concert with other unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

111.   In furtherance of the conspiracy, each of the coconspirators engaged in and facilitated overt acts, including but not limited to those set forth above—such as fabricating and withholding evidence—and was an otherwise willful participant in joint activity.

112.   As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and severe emotional distress.

113.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights

114.   As a direct and proximate result of the foregoing actions by Detectives **KENNON**, **STAMPER**, and **HOFFMAN**, and Sergeant **McFARLANE**, Plaintiff Webb was wrongfully arrested, prosecuted, convicted, and imprisoned for over

thirty-six years, suffering the following injuries and damages, among others:

    a.  Unreasonable seizure and loss of liberty;

    b.  Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.  Pain and suffering;

    d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.  Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f.  Loss of family relationships;

    g.  Damage to business and property;

    h.  Legal expenses;

    i.  Loss of earnings and earning potential; and

    j.  Continuing injuries and damages as fully set forth above.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff **KENNETH WEBB** respectfully requests:

    a.   A trial by jury on each of the Plaintiff's claims at law;

    b.   That the Court award compensatory damages to Plaintiff and against Defendant Estates of all the aforementioned Detectives and Sergeant,

33

jointly and severally, for physical, emotional, and economic injuries suffered by Plaintiff by reason of the aforementioned Detectives and Sergeants' unlawful and unjustified conduct, in an amount fair, just and reasonable and in conformity with the evidence at trial;

c.   That the Court award punitive and exemplary damages to Plaintiff, and against Defendant Estates, in an amount to be determined at trial, in order to deter such conduct against others in the future;

d.   A declaration that Defendant Estates violated the federal rights of Plaintiff pursuant to 28 U.S.C. § 2201;

e.   A declaration that Plaintiff was innocent of all felony accounts for which he was convicted pursuant to 28 U.S.C. § 2201;

f.   For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988  for all 42 U.S.C. § 1983 claims; and

g.   Any and all other relief to which he may be entitled, and which is just and proper.

## **JURY DEMAND**

Plaintiff, **KENNETH WEBB**, by and through his counsel, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Dayja S. Tillman
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Dayja S. Tillman (P86526)
**Goodman Hurwitz & James, PC**
684 W. Baltimore St., #201
Detroit, MI 48202
(313) 567-6170
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
dtillman@goodmanhurwitz.com

*Attorneys for Plaintiff*

Dated: November 3, 2025